[Cite as *State ex rel. US Tubular Prods., Inc. v. Indus. Comm.*, 2020-Ohio-3427.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. US Tubular Products, Inc.          :
d.b.a. Benmit Hydro-Testers Division,
                                                 :
          Relator,
                                                 :
v.                                                              No.  18AP-795
                                                 :
Industrial Commission of Ohio et al.,                           (REGULAR CALENDAR)
                                                 :
          Respondents.
                                                 :

---

D E C I S I O N

Rendered on June 23, 2020

---

**On brief:** *Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Edward D. Murray*, and *Aletha M. Carver,* for relator.

**On brief:** *Dave Yost*, Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

**On brief:** *Mario Gaitanos*, for respondent John R. Roush.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1}  Relator, US Tubular Products, Inc., d.b.a. Benmit Hydro-Testers Division, filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order finding relator had violated a specific safety requirement ("VSSR"), and that violation was the proximate cause of injuries to respondent John R. Roush.

{¶ 2}  Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact

and conclusions of law, which is appended hereto. The magistrate found the commission abused its discretion in granting an additional VSSR award under Ohio Adm.Code 4123:1-5-05(D)(1). Accordingly, the magistrate recommends this court grant relator's request for a writ of mandamus.

{¶ 3} The commission filed the following two objections to the magistrate's decision:

> [I.] The magistrate improperly reweighed the evidence relied upon by the commission to determine that the finding that Roush was an "operator" of the [hydro tester] was an abuse of discretion.

> [II.] The magistrate erred by finding the commission's decision to grant an additional award for the violation of Ohio Adm.Code 4123:1-5-05(D)(1) an abuse of discretion.

{¶ 4} No objections have been filed to the magistrate's findings of fact. After an independent review of the same, we adopt those findings of fact as our own. As set forth in more detail in the magistrate's decision, this case involves a "hydro tester," a diesel-powered machine that pressure tests pipes for leaks.  The typical process to pressure test a pipe requires the collaborative effort of two employees situated on opposite ends of the pipe.  Both employees manually attach a cap called a swage to their respective ends of the pipe.  The employee at the north end of the pipe then attaches a hose to the north swage; when water flows out of an opening on the south swage, the employee at the south end of the pipe closes a slide valve on the swage, then retreats to a marked safety zone located approximately 20 feet away from the pipe.  The employee at the north end of the pipe closes the pressure value on the hydro tester and pressurizes the pipe.  After the pressure test is complete, the employee at the north end of the pipe opens a pressure valve to relieve the pressure and then signals to the employee on the south end of the pipe that it is safe to re-approach the pipe.  The instrument panel, the means to shut off the hydro tester, and the valve to turn off the pressure are all located near the north end of the pipe at the hydro tester unit, a location well out of reach of the employee at the south end of the pipe during the typical testing process.

{¶ 5} On the day of the accident, Roush was working at the south end of the pipe and Phil Dronso was working on the north end of the pipe. After closing the slide valve on

the south end of the pipe and waiting in the safety zone, Roush believed Dronso gave him a hand signal to re-approach the pipe. Roush approached the pipe when it remained pressurized and was unscrewing his end of the pipe when the north swage blew off, hurling the body of the pipe into Roush and causing him extensive injuries. Roush applied for a VSSR award based on relator's alleged failure to comply with Ohio Adm.Code 4123:1-5-05(D)(1), which states, in pertinent part: "[m]eans shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply."[1]

{¶ 6} Following a hearing, the staff hearing officer ("SHO") determined relator failed to comply with Ohio Adm.Code 4123:1-5-05(D)(1). The SHO found relator's contention that Roush worked merely as a "test hand" and not a "true operator of the equipment" to be unpersuasive, and instead found Roush to be the "second test operator of the pipe" under the definition of operator set forth in Ohio Adm.Code 4123:1-5-01(B)(92). (May 23, 2017 SHO Order at 4.) Specifically, the SHO states:

> The Injured Worker's job duties consisted of working in coordination with the first test operator. The job of testing the pressurized pipe at the time of the industrial injury is found to require two operators working together to test the pipe. The Injured Worker's job duties as the second test operator were an integral part of the operation. The second test operator removed a swage from the tested pipe and put a swage on the next pipe to be tested. Additionally, the second test operator opened and closed an air vent after the pipe had been filled with water. The second test operator's duty of closing the pipe is instrumental in pressuring the pipe. Accordingly, the Injured Worker is found to be an operator of the equipment at issue.

(May 23, 2017 SHO Order at 4.) Therefore, because Roush was an operator, and all the controls to the machine were located at least 12 feet away from Roush at the time of the injury, the SHO found relator violated Ohio Adm.Code 4123:1-5-05(D)(1). Finally, the SHO found that relator's failure to comply with Ohio Adm.Code 4123:1-5-05(D)(1) was the proximate cause of Roush's injuries.

---

[1] Roush also applied for a VSSR award under Ohio Adm.Code 4123:1-5-17(I)(10) concerning barriers and warning devices and 4123:1-5-17(G)(1)(a)(1) concerning protective head gear. The staff hearing officer found Roush failed to establish a violation of either section. Roush did not challenge the staff hearing officer's order on these code sections.

{¶ 7}  After initially denying relator's motion for a rehearing, the commission granted relator's request for reconsideration, and a hearing was held in January 2018 on the issue of its authority to exercise its continuing jurisdiction and the merits of the VSSR request for rehearing.  The commission, by a two-to-one vote, determined it did not have authority to exercise its continuing jurisdiction and the SHO order would remain in full force.  The order states: "All evidence was reviewed and considered prior to rendering this decision."  (Jan. 9, 2018 SHO Order at 2.)

{¶ 8}  Considering relator's request for a writ of mandamus, the magistrate concluded the commission abused its discretion in two ways: (1) determining Roush to be an "operator" of the hydro tester as the predicate for a violation of Ohio Adm.Code 4123:1-5-05(D)(1), and (2) finding that Roush's lack of means to disengage the hydro tester from its power supply was the proximate cause of his injuries.  The commission's objections correspond to both conclusions.

{¶ 9}  In its first objection, the commission asserts the magistrate erred in determining Roush was not an "operator" of the hydro tester at the time of the industrial injury.  The commission contends the magistrate went beyond the constraints of our standard of review, which only asks this court to determine whether some evidence supports the commission's order, and notes this issue was a central, highly contested issue in the case with evidence presented supporting each side both at the May 2017 hearing before the SHO and upon the rehearing in January 2018.  The commission emphasizes that the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and  the commission's determination that Roush was an operator of the hydro tester is supported by Roush's affidavit and testimony.  We agree.

{¶ 10}  "To be entitled to an additional award for a VSSR, a claimant must show that (1) a specific safety requirement applied, (2) the employer violated that requirement, and (3) the employer's violation caused the injury."  *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 15.  "[B]ecause a VSSR award is a penalty imposed on an employer, specific safety requirements must be strictly construed and all reasonable doubts concerning the interpretation of a particular safety regulation must be resolved in favor of the employer."  *Id.* at ¶ 21.  However, "the strict-construction rule does not apply in resolving factual disputes. * * * It permits neither the commission

nor a reviewing court to construe the *evidence* of a VSSR strictly in the employer's favor." (Emphasis sic.)  *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, ¶ 70.

{¶ 11} "The interpretation of a specific safety requirement is within the final jurisdiction of the commission and may be corrected in mandamus only upon a showing that the commission abused its discretion." *Precision Steel* at ¶ 21. "So long as some evidence supports the commission's order, there was no abuse of discretion, and the court must uphold the decision."  *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.*, 144 Ohio St.3d 243, 2015-Ohio-4525, ¶ 13; *State ex rel. Bob Marshall Ents., Inc. v. Indus. Comm.*, 10th Dist. No. 11AP-816, 2013-Ohio-943, ¶ 10, citing *Supreme Bumpers* at ¶ 71 (A court "may not reweigh the evidence considered by the commission but must uphold its decision so long as it is supported by some evidence.").

{¶ 12} "In order to trigger the mandate of [Ohio Adm.Code 4123:1-5-05(D)(1)], the claimant must be an 'operator' of the [machine]." *State ex rel. Ohio Paperboard v. Indus. Comm.*, 152 Ohio St.3d 155, 2017-Ohio-9233, ¶ 12.  An "[o]perator" is defined as "any employee assigned or authorized to work at the specific equipment."  Ohio Adm.Code 4123:1-5-01(B)(92).

{¶ 13} Considering the issue of whether Roush was an "operator," the magistrate in this case took issue with the commission ignoring *State ex rel. Platt v. Diamond Internatl. Corp.*, 10th Dist. No. 85AP-979 (Jan. 29, 1987), and *State ex rel. Owens-Corning Fiberglas Corp. v. Indus. Comm.*, 62 Ohio St.2d 145 (1980).  Based on these cases, the magistrate determined "the fact that [Roush's] responsibilities were necessary for the proper operation of the machine is not the determining factor when deciding whether or not he was authorized to operate the machine." (Appended Mag.'s Decision at ¶ 84.)  The magistrate found the testimony showed Dronso was the employee assigned to operate the hydro tester, and that evidence Roush presented supporting the view that the pipe, swages, and hoses collectively formed the hydro tester machine is illogical.

{¶ 14} We agree with the commission that the magistrate improperly reweighed the evidence in this case. First, *Platt* and *Owens-Corning* were decided under a previous definition of "operator" limited to "any employee *authorized to operate* the equipment." (Emphasis added.)  *Platt*, citing Ohio Adm.Code 4121:1-5-01(B)(24); *Owens-Corning* at

146; *State ex rel. Owens-Corning Fiberglas Corp. v. Indus. Comm.*, 10th Dist. No. 79AP-293, (Sept. 20, 1979). The Supreme Court of Ohio considers the current definition of "[o]perator" provided in Ohio Adm.Code 4123:1-5-01(B)(92) to be "broad and requires only that one be 'assigned or authorized to work at the specific equipment.' " *Ohio Paperboard* at ¶ 15, citing Ohio Adm.Code 4123:1-5-01(B)(92). For example, in *Ohio Paperboard* the Supreme Court found that, since undisputed evidence showed the injured claimant was assigned to work at a power-driven conveyor as a maintenance mechanic, the commission did not abuse its discretion in determining the employee to be an operator under Ohio Adm.Code 4123:1-5-01(B)(92). *Id.* at ¶ 12-15. Considering the definition of Ohio Adm.Code 4123:1-5-01(B)(92) encompasses any employee assigned or authorized to work at the equipment at issue in a VSSR, we do not find *Platt* and *Owens-Corning* control the outcome of this case.

{¶ 15} Moreover, having independently reviewed the record, we find the commission's determination that Roush was an "[o]perator" pursuant to Ohio Adm.Code 4123:1-5-01(B)(92) is supported by some evidence. Similar to *Ohio Paperboard*, evidence in the record shows Roush was assigned to work at the hydro tester. We recognize that relator disagrees that the hydro tester machine extended to the components manually manipulated by Roush, but equally recognize that Roush submitted evidence to the contrary. We may not reweigh this evidence and serve as a "super commission." *State ex rel. Consolidation Coal Co. v. Indus. Comm.*, 78 Ohio St.3d 176, 177 (1997), quoting *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18, 20 (1987) ("To go further and assess the credibility of the evidence would place this court 'in the role of a "super commission," a role never envisioned by either the Ohio Constitution or the General Assembly.' "). Therefore, considering all the above, we find the SHO did not abuse its discretion in finding Roush to be an "operator" under the definition of Ohio Adm.Code 4123:1-5-01(B)(92) for purposes of establishing an Ohio Adm.Code 4123:1-5-05(D)(1) violation. *Ohio Paperboard* at ¶ 15; *Armstrong Steel Erectors* at ¶ 13. Likewise, the commission did not abuse its discretion in finding it lacked authority to exercise its continuing jurisdiction in this case based on Roush's status as an "operator" of the hydro tester.

{¶ 16} Accordingly, the commission's first objection is sustained.

{¶ 17} In its second objection, the commission asserts the magistrate erred by finding the commission's decision to grant an additional award for the violation of Ohio Adm.Code 4123:1-5-05(D)(1) to be an abuse of discretion.   The objection challenges the magistrate's determination that the commission abused its discretion in finding relator's violation of Ohio Adm.Code 4123:1-5-05(D)(1) proximately caused Roush's injury.

{¶ 18} "The absence of a prescribed safety device * * * standing alone, is not enough to sustain a VSSR violation. The claimant must also show that the lack of the device proximately caused the injury." *State ex rel. Lovell v. Indus. Comm.*, 74 Ohio St.3d 250, 251-52 (1996), citing *State ex rel. Bayless v. Indus. Comm.*, 50 Ohio St.3d 148 (1990). The determination of whether a specific safety regulation could have protected an employee from his injuries is factual.  *State ex rel. Silz v. Indus. Comm.*, 10th Dist. No. 03AP-749, 2004-Ohio-4100, ¶ 4.  "Questions of fact are exclusively within the commission's province. * * * Thus, the commission's ruling will be upheld absent an abuse of discretion." *Id.*; *State ex rel. Target Auto Repair Minutemen Select, Inc. v. Morales*, 10th Dist. No. 18AP-716, 2020-Ohio-83, ¶ 5 (*"Proximate cause is an issue for the trier of fact.").

{¶ 19} This court recently described the legal standard for proximate cause in the VSSR context as follows:

> It is generally understood that " 'where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.' " *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467 (1981), quoting *Clinger v. Duncan*, 166 Ohio St. 216, 222, 141 N.E.2d 156 (1957). Additionally, "when two factors combine to produce damage or illness, each is a proximate cause." *Norris v. Babcock & Wilcox Co.*, 48 Ohio App.3d 66, 67, 548 N.E.2d 304 (9th Dist.1988). *See also Murphy* [*v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 588 (1991)].

*Morales* at ¶ 5.  A claimant is not required to prove the extent to which protection afforded by a safety requirement would have eliminated or reduced his injuries.  *State ex rel. S&Z Tool & Die Co., Inc. v. Indus. Comm.*, 84 Ohio St.3d 288, 290 (1999) (finding proximate cause to be established where the claimant showed he was working around a foot hazard,

that foot protection was required but not provided, and that he was injured); *Bob Marshall Ents.* at ¶ 15.

{¶ 20} Furthermore, an employee's negligence in failing to protect himself from an injury does not bar a VSSR award since specific safety requirements are intended to protect employees against their own negligence and provide them a safe place to work. *Morales* at ¶ 8, citing *State ex rel. Byington Builders, Ltd. v. Indus. Comm.*, 156 Ohio St.3d 35, 2018-Ohio-5086, ¶ 40. "It is only the unilateral negligence of the injured employee that impacts the causation analysis." *Morales* at ¶ 8, citing *Byington Builders* at ¶ 40. "Unilateral negligence" involves cases "in which a rogue employee disregarded direct instructions to use certain safety equipment or disabled an employer-provided safety device." *Byington Builders* at ¶ 40. However, the defense of unilateral negligence is only available if the employer first complies with the applicable safety requirement. *Id.* at ¶ 39.

{¶ 21} Here, the commission again asserts the magistrate improperly substituted her opinion on the weight of the evidence for that of the commission. The commission essentially contends the magistrate errantly focused on what Roush knew and the actions of Roush and Dronso rather than on the fact that Roush had no way to prevent the injury once he re-approached the pipe. According to the commission, the evidence showed there was no means for Roush to disengage the pressure at his work site and the means to do so were over 12 feet away for him at the time of injury. The commission adds that a VSSR award should not be based on whether the injured employee is able to recognize a danger before it occurred.

{¶ 22} In its memo contra, relator asserts, "Roush's injury occurred not because he did not have a means to disengaged power to the Hydro Test Machine but because he approached the pipe when it was still pressurized." (Relator's Memo Contra at 21.) Relator additionally contends that because Roush was not an operator of the machine, he had no reason to disengage the machine from power since the true operator, Dronso, was the only one who knew the pipe was under pressure.[2]

---

[2] Relator also asserts for the first time that the SHO "in no way addresses proximate cause." (Relator's Memo Contra at 20.) We disagree. The SHO briefly addressed proximate cause on pages four and five of its order. The transcript of the January 2018 re-hearing also shows proximate cause was discussed within the context of the commission considering its authority to exercise its continuing jurisdiction.

{¶ 23} We agree with the commission's assessment. "The critical issue in a VSSR claim is always whether the employer complied with the SSR." *Ohio Paperboard* at ¶ 20 (finding the commission abused its discretion by rejecting the employer's argument that the employee's unilateral negligence caused his injury where the record contained evidence that the employer complied with the safety requirement at issue and it was the employee's failure to follow the employer's lock out policy that caused his injury).

{¶ 24} Here, unlike *Ohio Paperboard*, relator did not comply with the safety requirement at issue. Specifically, as concluded in the first objection, the commission did not abuse its discretion in finding Roush was an "[o]perator" of the hydro tester under Ohio Adm.Code 4123:1-5-05(D)(1). Furthermore, it is undisputed that the means to disengage the hydro tester from its power supply were located near Dronso, and that relator did not provide a means at the machine, within easy reach of Roush, for disengaging it from its power supply.[3] Therefore, because the SHO's conclusion that relator violated Ohio Adm.Code 4123:1-5-05(D)(1) stands, the unilateral negligence arguments raised by relator are unavailable. *Byington Builders* at ¶ 39.

{¶ 25} Lastly, to the extent relator argues Roush's lack of ability to know the pipe was pressurized or Dronso negligence caused the injury, we note that when multiple " 'factors combine to produce [an injury], each is a proximate cause.' " *Morales* at ¶ 5, quoting *Norris v. Babcock & Wilcox Co.*, 48 Ohio App.3d 66, 67 (9th Dist.1988). In other words, these contentions, even if true, do not negate the issue of whether the specific safety requirement violation here, Ohio Adm.Code 4123:1-5-05(D)(1), proximately caused Roush's injuries.

{¶ 26} Having independently reviewed the record and considered the arguments for and against issuance of the writ, on the facts of this case we find the SHO did not abuse its discretion in finding relator's violation of Ohio Adm.Code 4123:1-5-05(D)(1) proximately caused Roush's injuries. *S&Z Tool & Die Co.* at 290; *Bob Marshall Ents.* at ¶ 15; *Ohio Paperboard* at ¶ 20. Likewise, the commission did not abuse its discretion in finding it

---

[3] We note relator argued to the magistrate that doing so would be impossible. However, relator's argument in this regard is premised on relator's view of the constitution of "the machine" being limited to the unit near Dronso and, in accordance with that view, Roush not being located "at the machine." (*See* Relator's Brief at 36-39; Relator's Reply at 13-17; Memo Contra at 19.) As previously discussed, some evidence supports the commission's position that the hydro tester machine included the hose, pipe, and swages—in other words, components located at Roush's work station at the south end of the pipe.

lacked authority to exercise its continuing jurisdiction in this case based on proximate cause.

{¶ 27} Accordingly, the commission's second objection is sustained.

{¶ 28} Overall, relator has not established that it had a clear legal right to the relief requested and that the commission had a clear legal duty to provide it and, therefore, relator is not entitled to extraordinary relief in mandamus. *Bob Marshall Ents.* at ¶ 7; *State ex rel. Bonnlander v. Hamon*, 10th Dist. No. 18AP-501, 2019-Ohio-3861, ¶ 25. Therefore, following review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we adopt the magistrate's findings of fact, we reject the magistrate's conclusions of law and substitute them with our own, and we deny the requested writ of mandamus.

*Objections sustained;*
*writ of mandamus denied.*

BRUNNER, J., concurs.
LUPER SCHUSTER, J., dissents.

LUPER SCHUSTER, J., dissenting.

{¶ 29} Because I would grant relator's request for a writ of mandamus ordering the Industrial Commission of Ohio ("commission") to vacate its order finding a violation of Ohio Adm.Code 4123:1-5-05(D)(1), I respectfully dissent.

{¶ 30} The commission's first objection to the magistrate's decision centers on the magistrate's determination that the injured worker John Roush was not an "operator" of the hydro tester at the time of the industrial injury. The majority finds the magistrate improperly reweighed the evidence to reach her finding. In the majority's view, evidence was submitted supporting both sides of the issue and, therefore, this court cannot disturb the commission's operator finding. I agree, however, with the magistrate's determination that no evidence was submitted reasonably demonstrating that Roush was an operator of the hydro tester.

{¶ 31} Ohio Adm.Code 4123:1-5-05(D)(1) states that "[m]eans shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply." For the purpose of this rule, an "[o]perator" is "any employee assigned or authorized to work at the specific equipment." Ohio Adm.Code 4123:1-5-01(B)(92).

{¶ 32} Here, the basic facts surrounding the industrial accident are not in dispute. The machine involved was the hydro tester, a diesel-powered machine that pressure tests oil and gas industry pipes for leaks. A pipe test requires the collaborative effort of two individuals who position themselves approximately 40 feet apart at opposite ends of the pipe. Each places a cap on their respective end. At one end, the worker attaches a hydro tester hose to the cap for the purpose of pressurizing the pipe for testing. The instrument panel, the means to shut off the hydro tester, and the valve to turn off the pressure are located at this worker's end of the pipe. During the pressure testing, the other worker retreats to a safety zone approximately 20 feet from the pipe. Once the testing of a pipe is complete, the worker controlling the hydro tester releases the pressure and gives the other worker the signal to remove the cap at his end of the pipe. The process is repeated for each pipe to be tested. In this case, Roush, who had just approached a still pressurized pipe due to a miscommunication, was injured when the cap on the hydro tester controller's side failed, propelling the pipe into Roush.

{¶ 33} The issue of Roush's status as an operator hinges on whether he was working at the hydro tester at the time of the industrial injury. The majority reasons that, while relator disagrees that the hydro tester machine extended to the component's within Roush's control, namely the cap and the pipe, Roush submitted evidence to the contrary. In particular, engineer J. Douglas Jeter testified before the commission that both Roush and the hydro tester controller were operators because once the pipe was capped on both ends, and the hose was inserted, the pipe, caps, and hose became part of the hydro tester machine. Thus, under this view, the hydro tester machine itself extended to the pipe and cap near Roush. But, like the magistrate, I do not consider Jeter's testimony to constitute some evidence establishing Roush as an operator.

{¶ 34} In my view, whether Roush was an operator under the undisputed factual circumstances constituted a legal determination to be reached by the commission. Jeter's characterization of the pipe and cap within Roush's control as becoming part of the hydro tester machine is inconsistent with logic and common sense. The hydro tester machine was used to pressure test each pipe and the cap's usage as a fitting to close Roush's end of the pipe, for the purpose of the test, did not transform that object, or the pipe itself, into components of the hydro tester machine at the other end of the pipe. Thus, Roush was not

assigned or authorized to work at the hydro tester machine.  Because Roush was not an operator, there was no violation of Ohio Adm.Code 4123:1-5-05(D)(1).  This finding moots the proximate cause issue.

{¶ 35}  For these reasons, I respectfully dissent.

————————————————

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. US Tubular Products, Inc. dba Benmit Hydro-Testers Division, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No.  18AP-795 |
| | : | |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

### M A G I S T R A T E ' S   D E C I S I O N

#### Rendered on August 29, 2019

*Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Edward D. Murray,* and *Aletha M. Carver,* for relator.

*Dave Yost,* Attorney General, and *Natalie J. Tackett,* for respondent Industrial Commission of Ohio.

*Mario Gaitanos,* for respondent John R. Roush.

### IN MANDAMUS

{¶ 36} Relator, US Tubular Products, Inc., has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which found that relator had violated a specific safety requirement ("VSSR"), and that violation was the proximate cause of injuries to claimant, John R. Roush.

Findings of Fact:

{¶ 37} 1. Roush sustained a work-related injury on December 10, 2014 and his workers' compensation claim was allowed for the following conditions:

> Blunt trauma chest; frontal sinus fracture left; pneumothorax bilateral; sub Q emphysema bilateral; grade V liver laceration; retrohepatic vena cava injury; cardiac tamponade/blunt cardiac trauma; wall abrasion chest; intraperitoneal hemorrhage/blunt trauma abdomen; kidney injury closed bilateral; oral pharyngeal dysphagia; liver mass; traumatic hemorrhage liver; extensive hearing loss bilateral; right L5 radiculopathy; traumatic brain injury; left L4-L5 paracentral disc herniation; L4-L5 mild to moderate neural foraminal encroachment; L3-L4 mild disc bulge; bilateral L3-L4 mild neural foraminal encroachment.

{¶ 38} 2. On the day he was injured, Roush was working with another employee, Phil Drosnos. Their job responsibilities involved pressure testing pipes which were used in the oil and gas industry. The pipes were pressure tested to determine whether or not they could be reused. The hydro tester is a diesel powered machine used to pressurize the pipes. The hydro tester was located at the north end of the A-Line Facility ("building"). Drosnos was positioned at the north end of the building on the south side of the hydro tester. Roush was located approximately 40 feet to the south of the hydro tester. In between Drosnos and Roush were two rails which ran west to east. Those rails were used to hold and then transport individual pipes to be tested by rolling the pipes from the east end of the building in a westerly direction so that the north end of the pipe would be just to the south of the hydro tester. The hydro tester itself had three separate means by which it could be disengaged from power.

{¶ 39} 3. When a pipe was to be tested, the pipe was moved from the east end of the rails to the west end of the rails. At that time, Drosnos would attach a cap called a swage to the north end of the pipe. At the same time, Roush would attach a swage to the south end of the pipe. Drosnos would then insert a hose into an opening in his swage and begin to fill the pipe with water. Roush would wait until water came out of the opening in his swage. When that happened, Roush would manually close the slide valve on his swage enabling the pipe to fill with water and ultimately be pressurized. Once Roush closed the slide valve, he was to proceed to the safety zone marked in yellow. The safety zone was approximately

20 feet from the pipe being tested. Once Roush was in the safety zone, Drosnos would close the pressure valve on the hydro tester and pressurize the pipe. Approximately five seconds later, the test was complete. Drosnos would open the pressure valve to relieve the pressure. At that time, Drosnos would signal Roush that it was safe to approach the pipe. This process was then repeated over and over on remaining pipes.

{¶ 40} 4. On the day Roush sustained his injuries, Drosnos and Roush had attached their respective swages to a pipe. Roush had closed the slide valve on his swage and had retreated to the safety zone. Apparently, as he began to pressurize the pipe, Drosnos noticed that his end was leaking water. Without opening the pressure valve or disengaging the hydro tester from power, Drosnos approached his end of the pipe and attempted to tighten the swage to stop the leak. Roush, believing that Drosnos had given him the okay signal, approached his end of the pipe. At that time, the swage on the north end of the pipe where Drosnos was positioned blew off. The resulting pressure hurled the south end of the pipe into Roush's chest and threw him across the room causing his extensive injuries.

{¶ 41} 5. It is undisputed that Roush had no independent means to know whether or not a pipe was under pressure. All his information was gathered from Drosnos signaling him that it was safe to approach the pipe.

{¶ 42} 6. On the date he was injured, Roush did not know the pipe was under pressure when he approached it.

{¶ 43} 7. Roush filed an application seeking an additional award for relator's violations of three separate specific safety requirements. Ultimately, the commission found that relator violated one of the three alleged specific safety requirements. Roush does not challenge the commission's determination that two of the alleged violations were not applicable.

{¶ 44} 8. Specifically, Roush argued that both he and Drosnos were "operators" of the hydro tester and, as such, relator was required to provide both of them with a means by which they could easily disengage the hydro tester from its power supply. Specifically, Roush argued he was an operator as such is defined under Ohio Adm.Code 4123:1-5-01(B)(92): "Operator": any employee assigned or authorized to work at the specific equipment."

{¶ 45} Ohio Adm.Code 4123:1-5-05 applies to auxiliary equipment including the hydro tester at issue here. Subsection (D)(1) provides, in pertinent part: **"(D) Machinery control. (1) Disengaging from power supply.** Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply."

{¶ 46} 9. The Ohio Bureau of Workers' Compensation ("BWC") Safety Violations Investigation Unit ("SVIU") conducted an onsite investigation on October 27, 2016, almost two years after Roush's injuries. With regard to the hydro tester, the investigator noted the following:

> The tester was fabricated in house in approximately the late 1990's and did not have any model or serial number. The employer explained the tester consisted of one engine, two pumps, two swages, and one hose. The tester is used to evaluate pipe and determines if the pipe may be reused and identifies if the pipe is in need of repair. * * * There had not been any modifications to the tester since it was fabricated.
>
> The tester was inspected daily by Mr. Siffrin [the Quality Assurance Manager], the employer reported. Mr. Siffrin checked the parts on the tester and ensured the tester was working correctly. Mr. Siffrin stated he inspected the tester on the day of the injury, prior to the injury, and the tester was working correctly. The employer had received not any reports complaints or issues with the tester prior to the injury.

{¶ 47} 10. Relator explained the results of its incident investigation as follows:

> The employer advised their incident investigation revealed Mr. Drosnos stated the pipe was leaking and would not pressure up. Mr. Drosnos approached the pipe to tighten the swage (operator side). When Mr. Roush observed Mr. Drosnos approach the pipe, Mr. Roush also approached his side for the pipe (test hand end). The employer believed Mr. Roush was holding the test hand end of the pipe, when the swage on the operator side blew, causing the test hand end of the pipe and swage to strike Mr. Roush * * *. Mr. Siffrin further advised Mr. Drosnos should have disengaged the tester prior to approaching the pipe. The employer further believed Mr. Roush believed the tester had been disengaged because Mr. Drosnos approached the pipe; employees were not to approach the pipe while the tester was engaged.

{¶ 48} 11. Quality Assurance Manager Chris Siffron also explained that the hydro tester was equipped with three means to disengage it from power, all of which were located at the hydro tester itself:

> The first was a key, when activated this would turn off power to the engine * * *. The second is a lever that disengages the motor from the pump * * *. The third is a valve that turns off the pressure.

{¶ 49} 12. A statement had been taken from Drosnos within a few days of the incident. Drosnos indicated that Roush was trying to tighten the swage on his end so Drosnos approached his end to hold the pipe still. Drosnos indicated that he did not realize the pressure valve had vibrated closed as they were both in front of the pipe. Drosnos indicated he walked back toward the machine to close the pressure valve when the pipe exploded. Apparently, Drosnos did not report back to work and no other statements were ever taken from him.

{¶ 50} 13. The investigator talked to Roush who explained the incident indicating that he was in the safety zone while the pipe was being pressurized. Drosnos gave him the thumbs up sign indicating it was okay to return to the pipe. Roush returned to the pipe, began to unscrew his swage, when his swage blew off and struck him in the chest. (It is undisputed that it was the swage on the north end that blew off and the resulting pressure forced the entire pipe to be hurled toward Roush.)

{¶ 51} 14. Along with the investigation report, the investigator included copies of the monthly checks of the pressure gauges as well as relator's safety policy, and instructions for operating the hydro tester.

{¶ 52} 15. Relator hired Richard Artino, a certified safety professional, to investigate the incident. In his January 6, 2015 report, Artino summarized employee statements which were given, described the testing procedures, and took pictures of the various components used during the testing. He noted there were no specific VSSR safety requirements that deal with hydro static testing of metal pipes for the oil and gas industry. He also noted the ultimate conclusion was Drosnos did not completely screw his swage onto the pipe. As the pressure built inside the pipe, the first 11 threads on the swage flattened thereby allowing the swage to blow off and cause the pipe to shoot forward striking Roush in the chest. Photographs taken support this theory. Further, after examining the ball valve

which Drosnos claims had vibrated closed, Artino concluded that it was highly unlikely this happened, and noted further that the company had never had a problem with those valves vibrating open or closed.

{¶ 53} Artino concluded relator had complied with the specific safety requirements because there were means by which the power to the hydro tester could be shut off within easy reach of its operator, Drosnos.

{¶ 54} 16. Relator also submitted a report prepared by Curtis H. Speck, a safety consultant. In his May 16, 2017 report, Speck concluded Drosnos had neglected to properly attach the swage on his end of the pipe to prevent it from leaking and ultimately blowing the swage off his end of the pipe causing the injuries to Roush.

{¶ 55} 17. Roush submitted a report from J. Douglas Jeter, an engineer. In his January 20, 2017 report, Jeter concluded that both Drosnos and Roush were operators as defined in the Ohio Administrative Code and that relator was required to have a means to disengage the hydro tester from power within easy reach of both Drosnos and Roush. He concluded:

> If there had been a positive means for Mr. Roush to ensure the pipe pressure was relieved and/or a positive means of knowing whether the white and red levers were engaged before leaving his safe zone, the incident would have been avoided.

{¶ 56} Jeter also believed relator's failure to provide protective head gear as well as a safety barrier or other warning device that would have prevented Roush from stepping in front of the pipe were violated causing injuries to Roush.

{¶ 57} 18. Jeter testified at the hearings before both the staff hearing officer ("SHO") and the commission. Both times, Jeter testified that both Drosnos and Roush were operators as defined in the Ohio Administrative Code. Because Roush was an integral part of the process and the pipes could not be tested without him, Jeter indicated that he was an operator. Further, Jeter noted that Roush had no means to know when the pipe was under pressure and no means by which he could disengage power. He testified that both Drosnos and Roush needed to have a means by which they could disengage the hydro tester from power and further, that relator should have provided some visual means by which Roush could know the pipe was under pressure. In reaching this conclusion, Jeter stated that,

once the swages were attached to the pipe and the hose was inserted into the pipe, the machine, plus the hose, plus the swages, plus the pipe, all became part of the hydro tester machine. Upon that basis, both men were operators.

{¶ 58} 19. The matter was heard before an SHO on May 23, 2017. The SHO concluded that Roush had not demonstrated violations of either Ohio Adm.Code 4123:1-5-17(G)(1)(a)(i), which requires protective head gear or Ohio Adm.Code 4123:1-5-17(I)(10), which requires barriers and warning devices, and, as stated previously, Roush does not challenge the commission's determination that those specific safety requirements were not violated. The SHO did, however, conclude relator had violated Ohio Adm.Code 4123:1-5-05(D)(1), stating:

> 4123:1-5-05(D)(1) states in pertinent part:
>
> 4123:1-5-05 Auxiliary equipment.
>
> (D) Machinery Control.
>
> (1) Disengaging from power supply.
>
> Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment.
>
> The Injured Worker has established a violation of Ohio Administrative Code 4123:1-5-05(D)(1). This section pertains to the ability of the operator to disengage power supply. The methods to disengage the power supply included an on/off key, a lever to disengage the motor from the pump, and a valve that turned off the pressure. Although the machine at issue contained the means to disengage the power supply, the evidence supports a finding that said means were <u>not</u> "within easy reach of the operator" as required by the Ohio Administrative Code. As outlined herein, the means to disengage the power supply were located on the first operator's side of the operation. The Injured Worker indicated in his affidavit that the controls were approximately twelve feet or more away from him at the time of the injury. There is a lack of evidence the Injured Worker could "easily reach" any of the three provided means to disengage the machine. The three provided means to disengage the machine were located exclusively on the first operator's side of the machine.

The Employer contends this section does not apply to the Injured Worker as the Injured Worker was not an operator at the time of the injury. The Employer contends the Injured Worker was working as a "test hand" and not a true operator of the equipment. The Employer's contention is not found persuasive.

Ohio Administrative Code Section 4123:1-5-01(B)(92) defines "operator" as any employee assigned or authorized to work at the specific equipment. In the instant claim, the Injured Worker was assigned to perform the job duties as the second test operator of the pipe. The Injured Worker's job duties consisted of working in coordination with the first test operator. The job of testing the pressurized pipe at the time of the industrial injury is found to require two operators working together to test the pipe. The Injured Worker's job duties as the second test operator were an integral part of the operation. The second test operator removed a swage from the tested pipe and put a swage on the next pipe to be tested. Additionally, the second test operator opened and closed an air vent after the pipe had been filled with water. The second test operator's duty of closing the pipe is instrumental in pressurizing the pipe. Accordingly, the Injured Worker is found to be an operator of the equipment at issue.

The Injured Worker indicated in his affidavit dated 11/02/2016 that the controls were approximately twelve feet or more away from him at the time of the injury. There is a lack of evidence that the Injured Worker had access to the controls. The Injured Worker reported that his method of communicating with the first test operator was via hand signals. The Injured Worker reported in his affidavit that the first test operator had given him the "thumbs up" sign and the Injured Worker approached the pipe. The Injured Worker also reported in his affidavit that all of the controls were on the first test operator's side, and the Injured Worker could not reach the controls from his work station at the time of the injury. Accordingly, based on the affidavit and testimony of the Injured Worker, the Staff Hearing Officer finds that means were not provided within easy reach of the Injured Worker to disengage the machine from its power supply.

The Injured Worker has established entitlement to an award, based on the violation of 4123:1-5-05(D)(1). The safety code was in existence and effect on 12/10/2014, the date of the injury. The Employer failed to comply with the requirements of the code, as a means of disengaging the machine from its

power supply was not within easy reach of the Injured Worker. A distance of greater than twelve feet is not found to be within easy reach. The failure to comply with the safety code is the proximate cause of the injury. In the instant claim, there was no means for the Injured Worker to relieve the pipe pressure or disengage the machine. The Injured Worker sustained the injury after being struck by a pressurized pipe.

The Employer's contention that the application should be denied, based on the one-time malfunction defense, is not found persuasive. The Staff Hearing Officer notes the decision by the Supreme Court in State ex rel. M.T.D. Products, Inc. v. Stebbins, 43 Ohio St.2d 114, wherein the Court stated that a safety device that otherwise complies with the safety regulations and fails on a single occasion is not alone sufficient to find that the safety regulation was violated. In the case involving the instant Injured Worker, there is a lack of evidence that the Employer "otherwise complied" with the safety regulations as outlined in 4123:1-5-05(D)(1). As stated above, the Employer failed to provide a means within easy reach of the Injured Worker to disengage the machine from its power supply. Accordingly, there is a lack of evidence the Employer complied with this section and should be afforded the one-time malfunction defense. It is therefore ordered that an additional award of compensation be granted to the Injured Worker in the amount of 25 percent of the maximum weekly rate under the rule of State ex rel. Engle v. Indus. Comm., 142 Ohio St. 425.

It is the order of the Industrial Commission that the Employer is granted a period of sixty days from the mailing of this order to correct the violation found herein.

(Emphasis sic.)

{¶ 59} 20. Relator's motion for rehearing was denied by order of the commission mailed October 13, 2017.

{¶ 60} 21. Relator's request for reconsideration wherein relator argued that Roush was not an operator of the machine in question was granted and the SHO order was vacated in an order mailed November 30, 2017.

{¶ 61} 22. The matter was heard before the commission on January 9, 2018. At that time, the commission determined it did not have authority to exercise its continuing jurisdiction pursuant to R.C. 4123.52finding relator failed to meet its burden of proving

sufficient grounds to justify the exercise of such continuing jurisdiction. As a result, the prior SHO order from the May 23, 2017 hearing was reinstated.

{¶ 62} Commission member Karen L. Gillmor dissented, stating in part:

> I find instructive the 10th District Court of Appeals determination in *State ex rel. Platt v. Diamond Intern. Corp.,* 1987 WL 5893, 10th Dist. 1987. In upholding the Industrial Commission determination to deny an application for violation of the specific safety requirement, the Court held, "It is assumed that each employee assigned to a complex machine plays a useful and necessary role in the operation of the machine. Nevertheless, although decedent's responsibility of placing feeders into the machine was necessary for the proper operation of the machine, such responsibility does not require a determination that decedent was authorized to operate the machine. Decedent was a cutterman and as Adams testified, he was not in charge of the control panel. Consequently, he was not authorized to operate the equipment."
>
> Like the decedent in *Platt,* this Injured Worker played a useful and necessary role in the process, but he was not authorized to, and did not, operate the Hydro Test Unit. Instead, his duties involved assisting the operator, Mr. Dronos [sic], by preparing pipes for the pressure test.
>
> Also instructive is the Supreme Court decision in *State ex rel. Owens-Corning Fiberglass Corp. v. Indus. Comm.,* (1980) 62 Ohio St.2d 145, 404 N.E.2d 140, 16 O.O.3d 165. The Injured Worker argued that "operator" includes all employees who work at a machine and whose activity is necessary for its operation. The Court found the Injured Worker's definition of "operator" to be too inclusive. The Injured Worker was folding batts of fiberglass wool on a separate conveyor belt. His task was completed before the batts traveled to the packing machine. The Court held that "one merely folding batts on a conveyor belt carrying them to a separate packing machine cannot be an 'operator' of the packing machine for purposes of Ohio Adm.Code 4121:1-5-05(D)(1)."
>
> Like the Injured Worker in *Owens-Corning,* this Injured Worker's tasks (attaching and detaching the swage and shutting the valve) were completed before the Hydro Test Unit was engaged. Further, the Injured Worker's duties were performed at a location separate and apart from the Hydro Test Unit itself.

In *State ex rel. Scott Fetzer Co., Halex Div. v. Indus. Comm.,* (1998), 81 Ohio St.3d 462, 692 N.E.2d 195, 1998-Ohio-457, the Supreme Court found the Injured Worker to be an operator of the machine in question because he was actively involved in the operation of the machine. He started, inspected, and cleaned the machine. He operated the linkage mechanism and set die heights. He oiled the machine and checked for defective parts. He was responsible for lodged parts and correcting malfunctions. The Court therefore found he was not a casual observer with no responsibility for or participation in the machine's function.

In this case, the Injured Worker did not participate in the Hydro Test Unit's operation. Instead, after the Injured Worker assisted in preparing the pipe for testing, Mr. Dronos [sic] operated the Hydro Test Unit while the Injured Worker observed the pipe from the safety zone.

Because a violation of a specific safety requirement is a penalty, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216. I find reasonable doubt Ohio Adm.Code 4123:1-5-05(D)(1) should be interpreted to require the Employer to provide a means to disengage the power of the Hydro Test Unit to an employee not assigned to operate the unit and not located at the unit. Instead, I find the safety requirement clearly states the means to disengage the power of the machine is required at the machine, not any other location, and is to be within easy reach of the individual operating the machine.

A safety requirement must also be specific enough to plainly apprise an employer of its legal obligations to its employees. *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.* (1988), 37 Ohio St.3d 162, 524 N.E.2d 482. I find Ohio Adm.Code 4123:1-5-05(D)(1) is not sufficiently specific to plainly apprise the Employer it had a legal obligation to provide the pin end tester a means to disengage the Hydro Test Unit merely because the pin end test was part of the process. Instead, I find the safety requirement only requires the means to disengage the power supply be within easy reach of the operator of the equipment, and the pin end tester did not operate the Hydro Test Unit. Further, the cited safety requirement clearly requires only placement of a means to

disengage the machine from its power source at the machine, not at a location some 44 feet from the machine.

I find no evidence the Injured Worker was located at, assigned to, or had any responsibility for the operation of the Hydro Test Unit. Therefore, I conclude the Injured Worker was not an "operator" of the Hydro Test Unit for purposes of invoking application of Ohio Adm.Code 4123:1-5-05(D)(1).

After exercising continuing jurisdiction, I would deny the IC-8/9 Application for Additional Award for Violation of Specific Safety Requirement in a Workers' Compensation Claim, filed 08/01/2016, because the Injured Worker was not an operator of the machine in question and, therefore, Ohio Adm.Code 4123:1-5-05(D)(1) did not apply to him. I further find that by supplying three separate means to disengage the power supply at the Hydro Test Unit, the Employer complied with the requirements of Ohio Adm.Code 4123:1-5-05(D)(1). I would also affirm the portion of the Staff Hearing Officer order finding the Injured Worker failed to establish a violation of Ohio Adm.Code 4123:1-5-17(G)(1)(a)(i) and Ohio Adm.Code 4123:1-5-17 (I)(10).

{¶ 63} 23. Thereafter, relator filed this mandamus action in this court.

Conclusions of Law:

{¶ 64} For the reasons that follow, it is this magistrate's decision that this court should grant a writ of mandamus.

{¶ 65} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 66} In order to establish a VSSR, a claimant must prove that: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) the employer failed to comply with the requirements; and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972).

{¶ 67} The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193

(1983). Because a VSSR is a penalty, however, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion test. *Trydle*; *State ex rel. A-F Industries v. Indus. Comm.*, 26 Ohio St.3d 136 (1986); *State ex rel. Ish v. Indus. Comm.*, 19 Ohio St.3d 28 (1985). Furthermore, a safety requirement must be specific enough to plainly apprise an employer of its legal obligations to its employees. *State ex rel. Frank Brown & Sons v. Indus. Comm.,* 37 Ohio St.3d 162 (1988).

{¶ 68} In order to find a VSSR, the commission first had to determine that Roush was an operator, which is defined in Ohio Adm.Code 4123:1-5-01(B)(92) as follows: "Operator": any employee assigned or authorized to work at the specific equipment."

{¶ 69} No one disputes that Drosnos was an operator of the hydro tester and it was undisputed that there were three separate means by which Drosnos could disengage the hydro tester from power. Drosnos was stationed beside the hydro tester during the entire process of testing the pipes and those three means to disengage the machine from power were within his reach.

{¶ 70} By comparison, Roush, who was designated a "test hand," was approximately 40 feet away from the hydro tester, the rails and the pipe being tested were between him and the hydro tester, and there were no means whereby he could easily reach the hydro tester to disengage it from power. Furthermore, unlike a conveyor which is attached to a machine, nothing with which Roush came in contact was permanently attached to the hydro tester and the hydro tester did not move any objects toward Roush.

> In finding that Roush was an operator, the SHO order provides:

> In the instant claim, the Injured Worker was assigned to perform the job duties as the second test operator of the pipe. The Injured Worker's job duties consisted of working in coordination with the first test operator. The job of testing the pressurized pipe at the time of the industrial injury is found to require two operators working together to test the pipe. The Injured Worker's job duties as the second test operator were an integral part of the operation. The second test operator removed a swage from the tested pipe and put a swage on the

next pipe to be tested. Additionally, the second test operator opened and closed an air vent after the pipe had been filled with water. The second test operator's duty of closing the pipe is instrumental in pressurizing the pipe. Accordingly, the Injured Worker is found to be an operator of the equipment at issue.

The Injured Worker indicated in his affidavit dated 11/02/2016 that the controls were approximately twelve feet or more away from him at the time of the injury. There is a lack of evidence that the Injured Worker had access to the controls. The Injured Worker reported that his method of communicating with the first test operator was via hand signals. The Injured Worker reported in his affidavit that the first test operator had given him the "thumbs up" sign and the Injured Worker approached the pipe. The Injured Worker also reported in his affidavit that all of the controls were on the first test operator's side, and the Injured Worker could not reach the controls from his work station at the time of the injury. Accordingly, based on the affidavit and testimony of the Injured Worker, the Staff Hearing Officer finds that means were not provided within easy reach of the Injured Worker to disengage the machine from its power supply.

{¶ 71} Aside from the citation to Roush's affidavit, the SHO did not cite any other evidence to support this finding nor did the SHO discuss any cases dealing with the definition of an operator.

{¶ 72} Initially, it is clear from the Supreme Court of Ohio's decision in *State ex rel. Scott Fetzer Co., Halex Div. v. Indus. Comm.*, 81 Ohio St.3d 462 (1998), that the title which an employer gives to the job performed by the employee is not definitive of whether or not that employee is an operator of the machine. Kazimierz Chodubski was assigned to work at the number 38 die cast machine. At one point in time, this machine was completely manually operated. However, at the time Chodubski sustained his injuries, the machine had been extensively modified to accommodate a robotic device that retrieved newly formed parts after the die faces separated. Additional modifications include the removal of the machine's interlocking safety guards.

{¶ 73} The title of Chodubski's position was that of a "tender" and his responsibilities included initially activating the machine from a control panel as well as checking the die for flash or dirt and cleaning the die if necessary.

{¶ 74} On the day he was injured, the cast machine was making both good and bad parts and those bad parts were often sticking. Chodubski reported the situation to his foreman, but was instructed to keep the machine running until it could be inspected. At some point, Chodubski shut down the machine so that he could remove a part that was stuck. As he leaned in to remove that part, the dies closed unexpectedly and severely injured him.

> His claim was allowed for:
>
> [F]ractured rib, crush trauma to upper body with posterior rib fracture 4-8 on right and 6 on left, bilateral lung contusion, friction burns of upper arm and abrasion right shoulder and upper arm, closed head injury with broken upper denture plate and loose teeth, bilateral pneumothorax and left hemothorax; post traumatic stress reaction.

*Id.* at 463.

{¶ 75} Chodubski applied for additional compensation alleging a violation of Ohio Adm.Code 4121:1-5-11(D)(6) which required the danger zones on die casting machines must be guarded. The employer argued that Chodubski was not an operator, but that he was a tender. Among the evidence submitted was the deposition of Gerald C. Rennell who inspected the number 38 die cast machine after Chodubski's injury. When asked about the modifications to the machine, Rennell stated:

> "Q [Counsel]. All right. What about those modifications making the machine, in your opinion, unreasonably dangerous?
>
> "A [Rennell]. There was no safeguarding system at all. There was no safeguarding system at all now for the point of operation."
>
> When questioned as to the purpose of an operator on a robot-equipped machine, Rennell answered:
>
> "One might say if you have a robot in there the operator will never be in there, and, therefore, he will never be injured. Number one, that is not true with molten metal spit, obviously that is going to come out whether the operator is in there or not; and, number two, I have never seen an automatic operation in my life that always run[s] automatically. In other words typically what happens with an automatic operation, and this in not only on die cast machines, but virtually on any

> automatic machine, they run until something goes wrong and then that's why you have an operator, then the operator goes in and rectifies or repairs that problem. If you don't protect the operator against injury going in to make this[,] then you are certain to have injury."

*Id.* at 464-65.

{¶ 76} In finding a violation of Ohio Adm.Code 4121:1-5-11(D)(6), the commission stated:

> First, employer had an employee (claimant) whose principal assigned duty was to reach into the danger zone on a frequent basis, so it cannot be contended [that] exposure to the danger zone was so rare an event as to render use of the robot arm of equivalent protection to a physical enclosure. In this regard it is noted this requirement is not limited to the 'operating cycle.' Second, while it is true that projection of claimant's body into the danger zone was purposeful rather than accidental, there nevertheless was no guarding of the danger zone. To conclude [that] an employer's unequivocal violation of this requirement invokes a penalty and additional award only where the entry of the body part into the danger zone is by stumbling, backing into or being thrown into the danger zone is to render the requirement nearly a nullity in that there would be no requirement [for an] employer [to] do anything to protect an employee assigned to reach into a danger zone, and to neglect the methods of guarding which disengage the machine from its power supply when displaced or safely expel a body part whenever the machine is placed in motion."

*Id.*

{¶ 77} The employer sought a writ of mandamus asserting the commission's decision should be overturned arguing in part that Chodubski was not an operator. The court rejected this argument, stating:

> Fetzer also argues that claimant was not entitled to the protection of Ohio Adm.Code 4121:1-5-11(D)(6) because he was the "tender," not the "operator" of the machine. This contention fails as well. Regardless of what Fetzer chose to call claimant, he was actively involved in the machine's operation. Claimant started, inspected, and cleaned the die. He operated the linkage mechanism and set die heights. He oiled the die and checked for defective parts. He was responsible for lodged parts and correcting malfunctions. He was not, therefore, a

casual observer with no responsibility for or participation in the machine's function.

*Id.* at 466.

{¶ 78} In accordance with the *Scott Fetzer Co.* decision, it matters not that the title relator assigned to Roush's position was that of a "test hand." The title is not definitive.

{¶ 79} In concluding that Roush was an operator, the SHO discussed the fact that two workers were required to test the pipes and that Roush's job duties were an integral part of the operation. However, the SHO's decision ignores court decisions including in *State ex rel. Platt v. Diamond Internatl. Corp.,* 10th Dist. No. 85AP-979 (Jan. 29, 1987) and *Owens-Corning Fiberglas Corp. v. Indus. Comm.,* 62 Ohio St.2d 145 (1980).

{¶ 80} Stephen Platt was employed by Diamond International Corporation as a " 'cutterman' which is distinct from a 'third hand' who is the operator of the machine." The investigation report conducted by the commission found that Don MacBeth was the third hand or operator of the machine at the time the accident occurred. Testimony presented at the commission hearing supported this finding:

> Michael Lee Dick testified that he was employed as a cutterman and was working in close proximity to decedent at the time of the accident. He testified that decedent was standing at the back end of the machine. According to Dick, decedent was placing feeders, which are small pieces of paper scrap, into the rolls of paper as it was rewinding in order to smooth the rolls. This was required for the normal operation of the machine. Dick testified that another employee working on the machine called for more feeders and while responding to the request, decedent stumbled and was pulled into the rewinding machine as it rewound paper at a high rate of speed.
>
> Robert Adams also testified that he too was a cutterman on a machine which operated basically the same. Adams stated that to properly run the machine involved the following:
>
> "A. * * * [O]ne man has to watch the shavings, *one man runs the machine*, and another man is suppose to stand back on the back side to make sure the rolls run up straight." (Emphasis added.) (Tr. 21.)
>
> Although decedent placed feeders into the machine to ensure that the paper would be properly rewound, he was not

authorized to operate the machine. Adams further testified as follows:

"Q. Have you ever, yourself, operated this machine?

"A. No.

"Q. So you never stood at the controls, sir?

"A. No, that is third man. I never got higher than number two man." (Tr. 22.)

Thus, it can be inferred that decedent, who held the same job classification and performed basically the same duties as Adams, also was not authorized to operate the machine. Subsequently, when Adams was asked who operated the machine at the time of the accident, he testified that Don MacBeth was the operator.

[I]t is assumed that each employee assigned to a complex machine plays a useful and necessary role in the operation of the machine. Nevertheless, although decedent's responsibility of placing feeders into the machine was necessary for the proper operation of the machine, such responsibility does not require a determination that decedent was authorized to operate the machine. Decedent was a cutterman and as Adams testified, he was not in charge of the control panel. Consequently, he was not authorized to operate the equipment.

The fact that a power disengagement switch was located within four feet of decedent's work station does not establish an inference that decedent was an operator as defined by Ohio Adm. Code 4121:1-5-01(B)(24). A power disengagement switch is a safety device and is not used to operate the machine.

The hearing officer did not expressly state that decedent was not an operator, but he found that:

"Deceased was assigned to a slitter - rewinder machine, although we was not in charge of the controls."

Implicit in the hearing officer's findings that decedent was not in charge of the controls is that decedent was not authorized to operate the machine. As indicated above, Don MacBeth was the operator of the machine at the time of the accident.

> Where the record contains some evidence to support the commission's findings, there has been no abuse of discretion by the commission and mandamus will not lie. *State, ex rel. G F Business Equip., Inc., v. Indus. Comm.* (1981), 66 Ohio St. 2d 446; *State, ex rel. Williams v. Indus. Comm.* (1984), 11 Ohio St. 3d 240. Considering the investigator's report, the testimony presented at the hearings, and the other evidence in the record, there was some evidence to support the findings of the commission.

{¶ 81} In *Owens-Corning,* Homer Sharp was employed by Owens-Corning Fiberglas Corporation when he injured his foot within the scope of and in the course of his employment.  At the time of the injury:

> [Sharp] was folding batts of fiberglass wool as they proceeded along a conveyor belt in front of him. A second employee removed the folded batts from the conveyor belt and stacked them. A third employee placed the stacked batts in a packing machine. While the third employee was compressing the stacked batts within the machine, a fourth employee attached a bag at the front of the packing machine and pressed the start button causing the machine to ram the pressed batts into the bag. As the packing machine is filling the bag, it drags a guide bar forward along a track constructed in the rear part of the machine to a point for the automatic release of the ram bar. During one of these bag filling operations, [Sharp], *while folding the batts on the separate conveyor belt*, lifted his foot onto the nearby packing machine. His foot caught on the guide bar which had been out of line seven or eight inches causing his injury. [Sharp's] claim for workers' compensation was allowed. He then filed an application for an additional award for violation of specific safety requirements. The Industrial Commission allowed the additional award finding that appellee violated specific safety requirement IC-5-03.07(A).

(Emphasis sic.) *Id.* at 145.

{¶ 82} Sharp argued the term operator includes all employees who work at a machine and whose activity is necessary for the operation of that machine.  However, the court found this definition to be too inclusive:

> At the time of his injury, [Sharp] was folding batts of fiberglass wool on a separate conveyor belt. His task was completed before the batts traveled to the packing machine. Thus, we

> hold that one merely folding batts on a conveyor belt carrying them to a separate packing machine cannot be an "operator" of the packing machine for purposes of Rule 4121:1-5-05(D)(1). Therefore, we agree with the Court of Appeals that the order of the commission granting an additional award to appellant was contrary to law.

*Id.* at 146.

{¶ 83} Testimony presented at the hearing in the instant case indicates that Drosnos was the employee who was assigned to operate the hydro tester. Drosnos was the one responsible for turning on the water which filled the pipe and with activating the hydro tester so the hydro tester would pressurize the pipe. While Roush was required to attach his swage and to manually close the valve on his swage, Roush was not assigned to nor authorized to operate the hydro tester.

{¶ 84} Like Platt, Roush's duties were an integral part of the operation and the operation could not take place without him; however, the fact that his responsibilities were necessary for the proper operation of the machine is not the determining factor when deciding whether or not he was authorized to operate the machine.

{¶ 85} The only evidence presented other than Roush's testimony, on which the commission could have relied in finding that Roush was an operator, is the report and testimony that Jeters provided. As part of his explanation that Roush's duties were integral to the operation of the hydro tester, Jeters also indicated that each and every pipe which was tested became a part of the hydro tester machine by virtue of the fact that swages were attached at each end of the pipe and a hose was inserted into the pipe so the pipe could be filled with water. However, the purpose of the pipes themselves is to transport oil and gas while the purpose of the hydro tester machine is to determine whether or not those pipes are capable of sustaining the pressures to which they will be subjected if they are to again be used to transport oil and gas. The magistrate finds that it is illogical to find that each and every pipe that is tested actually becomes a part of the hydro tester unit. As such, the magistrate concludes that it was an abuse of discretion for the commission to conclude that Roush was an operator.

{¶ 86} However, even if this court was to disagree with the magistrate's conclusion the commission abused its discretion when it determined that Roush was an operator, the magistrate finds the commission's additional award for relator's violation of a VSSR

constitutes an abuse of discretion. As noted earlier, it is undisputed that, when he approached the pipe, Roush was completely unaware the pipe was under pressure. Without knowing the pipe was under pressure, Roush had no way to know he was in any danger. Without knowing he was in any danger, Roush had no reason to disengage the hydro tester from power. Therefore, Roush's lack of means to disengage the hydro tester was not and could not have been the proximate cause of his injuries.

{¶ 87} Cases which deal with injuries sustained by employees who are exposed to pinch points or other dangers demonstrate the need for a means to disengage the machines from power typically to lessen injuries. For example, an employee whose glove gets caught in the mechanisms of a machine and whose hand is being pulled into the machine, needs a means to disengage that machine in order to minimize his injuries. That employee recognizes that he is in danger. Guards on machines act in a similar fashion because they keep the employee from coming into contact with a known danger. An employee who removes a guard is exposing himself to that danger.

{¶ 88} As part of his report, Jeters cited Ohio Adm.Code 4123:1-5-17(I)(10), which requires that an employer provide barriers and effective warning devices such as flasher lights where employees are exposed to working conditions where a hazard may exist. In his report, Jeters stated:

> Mr. Roush was exposed to working conditions where a hazard from the pressurized pipe existed. Benmit acknowledged this hazard when they designated a "safe zone" behind the yellow line. However, Benmit did not provide:
>
> - Barriers to prevent the second operator from entering the "danger zone" when the pipe was pressurized
> - Barrier that would protect the second operator from a sudden release of hydraulic energy from a pipe at pressure
> - Barriers to prevent the second operator from standing in front of the end of the pipe
> - An effective warning device (such as a light) that would indicate when the pump was engaged
> - An effective warning device (such as a light) that would indicate when the check valve was engaged
> - An effective warning device (such as a light) that would indicate when the pipe was pressurized

> These measures are equally applicable to protecting the safety
> of both operators. The implementation of one or more of these
> measures on Mr. Roush's end of the test rig would have
> prevented the incident.

(Emphasis sic.)

{¶ 89} If Roush would have known the pipe was still under pressure, Roush would not have approached the pipe. Unfortunately, when Drosnos approached the pipe without disengaging it from power, Roush concluded it was safe to approach the pipe. It is undisputed that he would have been unable to hear that the pipe was still under pressure or that there would have been any visual indication that the pipe was under pressure. Jeter had testified that a means to disengage the machine from power which would have been located in the safety zone would have met the requirement; however, when Roush left the safety of the safety zone and approached the pipe, he did so because he did not know the pipe was under pressure—he did not know he was in danger. Further, even if relator would have supplied Roush with a hand-held controller capable of disengaging the hydro tester from power, as he approached the pipe without knowing it was still under pressure, he had no reason to disengage the machine from power. Drosnos was the only one who knew the pipe was under pressure. As relator determined, Drosnos should have either opened the pressure valve to relieve pressure or disengaged the machine from power before he approached it to tend to the leak. Having failed to do so, he placed both himself and Roush in a dangerous position. Drosnos made a mistake and that mistake cost Roush dearly. However, Roush's injuries were not the result of relator's failure to provide him with a means to disengage the hydro tester. The commission's finding constitutes an abuse of discretion and this court should issue a writ of mandamus ordering the commission to vacate its order which found violation of Ohio Adm.Code 4123:1-5-05(D)(1).

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).