[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. U.S. Tubular Prods., Inc. v. Indus. Comm.*, Slip Opinion No. 2021-Ohio-1174.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-1174

THE STATE EX REL. U.S. TUBULAR PRODUCTS, INC., D.B.A. BENMIT HYDRO-TESTERS DIVISION, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. U.S. Tubular Prods., Inc. v. Indus. Comm.*, Slip Opinion No. 2021-Ohio-1174.]

*Workers' compensation—Violation of specific safety requirement—Industrial commission did not abuse its discretion in granting additional award—Record contained evidence supporting commission's findings that specific safety requirement applied, that employer violated it, and that violation was proximate cause of injury—Court of appeals' judgment denying writ of mandamus affirmed.*

(No. 2020-0883—Submitted January 26, 2021—Decided April 8, 2021.)

APPEAL from the Court of Appeals for Franklin County, No. 18AP-795, 2020-Ohio-3427.

_____

**Per Curiam.**

{¶ 1} Article II, Section 35 of the Ohio Constitution allows for an award of additional compensation to a worker who sustains injuries as a result of his employer's violation of a specific safety requirement ("VSSR"). *See also* R.C. 4121.47. Appellee Industrial Commission granted appellee John R. Roush's request for such an award. Roush's employer, appellant, U.S. Tubular Products, Inc., d.b.a. Benmit Hydro-Testers Division, asked the Tenth District Court of Appeals to issue a writ of mandamus ordering the commission to vacate its decision. The Tenth District denied the writ, and U.S. Tubular appealed.

{¶ 2} Because the commission's decision was supported by evidence in the record, we affirm the Tenth District's judgment.

## I. FACTS AND PROCEDURAL HISTORY

### A. Hydro-Testing

{¶ 3} U.S. Tubular's operations include the "hydro-testing" of used pipes. Hydro-testing involves forcing water pressure into a pipe to determine whether the pipe leaks and needs to be repaired or does not leak and may be reused. U.S. Tubular conducts these tests in a three-sided building known as the "test shelter." The process requires at least two employees; typically, one employee is stationed at each end of the pipe being tested.

{¶ 4} Pipes roll into the test shelter on 42-inch-high racks that divide the shelter into a north and south end. The employee at the north end attaches a cap called a swage to that end of the pipe. Attached to the north-end swage is a hose connected to a pump, which is in turn connected to a diesel engine. The north-end employee then engages the pump, causing water to flow into the pipe.

{¶ 5} The south-end employee attaches a swage to that end of the pipe. The south-end swage contains a slide valve. As the water flows into the pipe, it displaces the air in the pipe, which exits through the slide valve. When water begins flowing through the slide valve, indicating that all the air has been pushed out of

the pipe, the south-end employee slides the valve closed, by hand, thereby sealing the pipe for pressurization.

{¶ 6} During the hydro-test, the two employees must retreat to designated "safety zones" at each end of the test shelter. The controls for the hydro-test machine are located in the north-end safety zone. The safety zones are necessary because a swage sometimes blows off of a pressurized pipe. For that same reason, U.S. Tubular has erected a "blast shield" to keep swages from going through the wall of the test shelter.

{¶ 7} Once the south-end employee is in that end's safety zone, the north-end employee uses a lever and valve to increase the water pressure in the pipe to the desired level. The pressure is maintained for a specific amount of time, during which both employees, from their safety zones, observe the pipe for leaks. Then, the north-end employee uses the controls to release the pressure in the pipe.

{¶ 8} The north-end employee signals the south-end employee when the pressure has been released and it is safe to approach the pipe. This is typically done by a "thumbs-up" sign or by the north-end employee simply leaving the safety zone and moving toward the pipe. The employees must rely on visual signals because the controls and pressure gauge for the hydro-tester are all housed in the north-end safety zone and the testing process is too loud for them to communicate by voice. The north-end controls provide the north-end employee with three means to disengage the machine.

{¶ 9} The employee in the south end, whose safety zone is located behind a yellow line, has no means to control the pressure or disengage the machine's power and has no gauges or other means that show when the pipe is under pressure. The south-end employee cannot reach the machine's controls from the south-end safety zone and cannot efficiently take shelter in the north-end safety zone. The employees are unable to communicate verbally because the work environment is noisy, the employees wear ear protection, and the employees do not have radios.

{¶ 10} Once the hydro-test is complete and the pressure is released, the employees remove the swages from their respective ends of the tested pipe, the pipe is marked to indicate the test result, and the team moves on to the next pipe, repeating the process.

### B. Roush's Injury

{¶ 11} Roush sustained injuries while performing a hydro-test at U.S. Tubular on December 10, 2014. He was working at the south end of the test shelter. The employee working at the north end of the test shelter was Phil Drosnos.

{¶ 12} Roush and Drosnos attached their swages to a pipe that was 32 feet long and approximately eight to ten inches in diameter. They then retreated to their safety zones, and Drosnos engaged the pressure lever, pressurizing the pipe. Drosnos apparently noticed that a swage was leaking; he left the safety zone and approached the pipe to tighten the swage.

{¶ 13} The record is unclear whether Drosnos gave Roush a "thumbs up" or whether Roush merely believed it was safe to approach the pipe because Drosnos approached it. Regardless, Roush also left his safety zone and approached the pipe. Drosnos then apparently realized that the pipe was still under pressure and returned to his safety zone to depressurize it. Before Drosnos reached the pressure lever, however, the swage on his end blew off, and the pent-up pressure projected the pipe forward. It struck Roush in the abdomen with extreme force, knocking him to the ground, where he hit his head on a floor grate. Roush sustained severe injuries. His workers' compensation claim was allowed for numerous abdominal, head, face, and back conditions.

### C. VSSR Award

{¶ 14} Roush filed an application for a VSSR award, asserting that U.S. Tubular had violated three specific safety requirements set forth in the Ohio Administrative Code. The Bureau of Workers' Compensation's Safety Violations Investigation Unit conducted a site visit and interviewed U.S. Tubular personnel.

The investigator prepared a report that included photographs and a video of the hydro-test operation.

{¶ 15} Both Roush and U.S. Tubular engaged experts to evaluate the incident; each expert prepared a report. The bureau's investigation report and the experts' reports were submitted to the commission, which also heard live testimony.

{¶ 16} The staff hearing officer ("SHO") denied Roush's VSSR claim with respect to Ohio Adm.Code 4123:1-5-17(G)(1)(a)(i) (regarding protective headgear) and 4123:1-5-17(I)(10) (regarding barriers and warning devices).

{¶ 17} But the SHO determined that Roush had established a violation of Ohio Adm.Code 4123:1-5-05(D)(1), which provides, "Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply." The SHO noted that Ohio Adm.Code 4123:1-5-01(B)(92) defines "operator" as "any employee assigned or authorized to work at the specific equipment." The SHO determined that Roush was an "operator" of the hydro-test machine, explaining:

> The job of testing the pressurized pipe at the time of the industrial injury is found to require two operators working together to test the pipe. The Injured Worker's job duties as the second test operator were an integral part of the operation. * * * The second test operator's duty of closing the pipe is instrumental in pressurizing the pipe.

The SHO also determined that the means of disengaging the equipment from its power supply were not within Roush's easy reach.

{¶ 18} Finally, the SHO found that the failure to comply with the safety code was the proximate cause of Roush's injury. The SHO noted that there was no way for Roush to disengage the machine and relieve the pipe pressure and that

Roush was injured when he was struck by a pressurized pipe. The SHO granted a VSSR award of an additional 25 percent of the maximum weekly rate of compensation.

{¶ 19} U.S. Tubular moved for rehearing. A different SHO denied the motion. U.S. Tubular then moved for reconsideration. The commission vacated the rehearing-denial order and set the matter for a hearing before the commissioners.

{¶ 20} At that hearing, the parties addressed two issues: (1) whether the commission had the authority under R.C. 4123.52 and *State ex rel. Nicholls v. Indus. Comm.*, 81 Ohio St.3d 454, 459, 692 N.E.2d 188 (1998), to exercise continuing jurisdiction over the claim on the basis of a clear mistake of fact or law and (2) if the commission exercised jurisdiction, whether the VSSR award should be denied. The commission determined that it lacked the authority to exercise continuing jurisdiction, reinstated the rehearing-denial order, and reiterated that the original SHO order granting the VSSR award remained in effect.

### D. Mandamus Action

{¶ 21} U.S. Tubular filed a mandamus complaint in the Tenth District, seeking a writ compelling the commission to vacate the VSSR award. A magistrate recommended granting the writ. 2020-Ohio-3427, ¶ 2. The commission objected. *Id*. at ¶ 3. The Tenth District sustained the commission's objections and denied the writ. *Id*. at ¶ 28. U.S. Tubular appealed the Tenth District's judgment.

## II. ANALYSIS

### A. Legal Standards

{¶ 22} "An award for a VSSR is 'a new, separate, and distinct award' over and above standard workers' compensation benefits." *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, 47 N.E.3d 109, ¶ 15, quoting *State ex rel. Newman v. Indus. Comm.*, 77 Ohio St.3d 271, 272, 673 N.E.2d 1301 (1997). "To be entitled to an additional award for a VSSR, a claimant

must show that (1) a specific safety requirement applied, (2) the employer violated that requirement, and (3) the employer's violation caused the injury." *Id*.

{¶ 23} "To prevail on its claim for mandamus relief, [U.S. Tubular] must demonstrate that the commission's decision to issue a VSSR award was an abuse of discretion. So long as some evidence supports the commission's order, there was no abuse of discretion, and the court must uphold the decision." *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.*, 144 Ohio St.3d 243, 2015-Ohio-4525, 41 N.E.3d 1233, ¶ 13.

{¶ 24} "The interpretation of a specific safety requirement is within the final jurisdiction of the commission and may be corrected in mandamus only upon a showing that the commission abused its discretion." *Precision Steel* at ¶ 21. "[B]ecause a VSSR award is a penalty imposed on an employer, specific safety requirements must be strictly construed and all reasonable doubts concerning the interpretation of a particular safety regulation must be resolved in favor of the employer." *Id*.

### B. Proposition of Law Nos. 1 and 2
### *The commission's determination that Roush was an "operator" of the hydro-test machine was supported by evidence in the record*

{¶ 25} Ohio Adm.Code 4123:1-5-05(D)(1) provides, "Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply." Ohio Adm.Code 4123:1-5-01(B)(92) provides that an "operator" is "any employee assigned or authorized to work at the specific equipment."

{¶ 26} In proposition of law No. 1, U.S. Tubular argues that the commission abused its discretion by finding that Roush was an operator of the hydro-test machine. Specifically, U.S. Tubular asserts that Roush was not "assigned or authorized to work at" the hydro-test machine, as required by Ohio Adm.Code 4123:1-5-01(B)(92). U.S. Tubular asserts that Roush worked 44 feet away from

the machine, i.e., that the machine encompassed only the diesel engine and pump on the north end of the test shelter and had no components in the south end of the test shelter, at Roush's end of the pipe. Therefore, U.S. Tubular asserts, Roush did not operate the hydro-test machine.

{¶ 27} Relatedly, in proposition of law No. 2, U.S. Tubular argues that the requirements of Ohio Adm.Code 4123:1-5-05(D)(1) apply only to a machine—not to a facility or a process—and that it would be impossible to provide a means of disengaging the hydro-test machine's power that is both (1) within easy reach of Roush and (2) "at [the] machine," as Ohio Adm.Code 4123:1-5-05(D)(1) requires, because Roush worked 44 feet away from the machine.

{¶ 28} It is undisputed that Ohio Adm.Code 4123:1-5-05(D)(1) applies to the hydro-test machine and that U.S. Tubular did not provide a means of disengaging the machine's power within easy reach of Roush. Proposition of law Nos. 1 and 2 therefore both hinge on whether Roush's work area at the south end of the test shelter placed him at the hydro-test machine. This question lies within the final jurisdiction of the commission. *Precision Steel*, 145 Ohio St.3d 76, 2015-Ohio-4798, 47 N.E.3d 109, at ¶ 21; *State ex rel. Lange v. Indus. Comm.*, 111 Ohio St.3d 563, 2006-Ohio-6211, 857 N.E.2d 593, ¶ 14. We may not find an abuse of discretion so long as the commission's determination is supported by some evidence in the record, regardless of whether the record also contains contrary evidence—even if greater in quantity or quality. *State ex rel. Vonderheide v. Multi-Color Corp.*, 156 Ohio St.3d 403, 2019-Ohio-1270, 128 N.E.3d 188, ¶ 14.

{¶ 29} Evidence in the record supported the commission's determination that Roush was an operator of the hydro-test machine, i.e., that he was "assigned or authorized to work *at the specific equipment*," (emphasis added) Ohio Adm.Code 4123:1-5-01(B)(92). More specifically, there was evidence from which the commission could conclude that the components of the hydro-test machine included the swage and slide valve that Roush was assigned to use. The Safety

8

Violations Investigation Unit's report states, "The employer explained the tester consisted of one engine, two pumps, *two swages*, and one hose." (Emphasis added.) The employer therefore acknowledged to the investigator that the swage at Roush's end of the pipe was a component of the hydro-test machine.

{¶ 30} Further, while U.S. Tubular now appears to argue that the "machine" (a term that is not defined in the applicable code sections) is limited to the diesel engine and pump located at the north end of the test shelter, it is undisputed that the purpose of the hydro-test machine is not merely to pump water through a pipe but to *pressurize* the pipe. And U.S. Tubular concedes that the hydro-tester cannot pressurize the pipe without Roush first installing the south-end swage and then closing that swage's slide valve to seal the system for pressurization.

{¶ 31} The record also contained the report and testimony of Roush's expert witness, J. Douglas Jeter, a registered professional engineer. Jeter opined that both Roush and Drosnos were operators of the hydro-test machine because "[t]he operation cannot be accomplished by one person" and because Roush's duties— including closing the valve on his swage—were "an integral part of the pressurization test."

{¶ 32} In Jeter's opinion, when the elements were all connected, they constituted one machine: "When it is all connected, you have the south end swage connected to the pipe connected to the north end swage connected by a hose to the ball valve connected to the pump connected to the motor." Roush was therefore "operating his end of the unit which allows the system to become pressurized." And both employees are necessary for the machine to do its job: "If the north end operator does not activate the valve, the ball valve, there won't be any pressure. If the south end operator does not close the [slide] valve, there won't be any pressure." In his report, Jeter pointed out the problem, from a safety perspective, with the fact that both Roush and Drosnos interacted with the machine and were in equal danger in the event a pressurized pipe blew, yet only Drosnos had access to the controls:

"Despite Mr. Roush's safety being equally affected by the pressurization of the system, he had no means of ensuring that it was in a zero energy state when he approached it."

{¶ 33} U.S. Tubular argues that three cases support the conclusion that the commission abused its discretion by concluding that Roush was an operator of the hydro-test machine. It argues that in *State ex rel. Scott Fetzer Co., Halex Div. v. Indus. Comm.*, 81 Ohio St.3d 462, 692 N.E.2d 195 (1998), the employee was found to be an "operator" because he was "actively involved in the machine's operation," *id*. at 466. However, our opinion in *Scott Fetzer* did not alter the definition of "operator" set forth in Ohio Adm.Code 4123:1-5-01(B)(92), under which the commission reasonably found Roush to be an operator of the hydro-test machine. The remaining two cases applied a different definition of "operator" that predated the current definition set forth in Ohio Adm.Code 4123:1-5-01(B)(92). *See State ex rel. Owens-Corning Fiberglas Corp. v. Indus. Comm.*, 62 Ohio St.2d 145, 146, 404 N.E.2d 140 (1980); *State ex rel. Platt v. Diamond Internatl. Corp.*, 10th Dist. Franklin No. 85 AP-979, 1987 WL 5893, *1 (Jan. 29, 1987). Those cases are therefore inapplicable.

{¶ 34} Finally, U.S. Tubular invokes *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162, 524 N.E.2d 482 (1988), for the proposition that a safety requirement must be specific enough to plainly apprise the employer of its duty to the employee, *id*. at 163. Ohio Adm.Code 4123:1-5-05(D)(1), in conjunction with Ohio Adm.Code 4123:1-5-01(B)(92), requires employers to provide a means of disengaging a machine's power supply within easy reach of employees assigned or authorized to work at the machine. Based on U.S. Tubular's initial explanation of the hydro-test machine to the investigator, which stated that the machine included both the north- and south-end swages, the record contains evidence that U.S. Tubular was plainly apprised that both employees worked at the

hydro-test machine and should therefore have been provided with an easily reachable means of disengaging the power.

{¶ 35} We reject proposition of law Nos. 1 and 2.

### C.  Proposition of Law No. 3

***The commission's determination that U.S. Tubular's VSSR caused Roush's injury was supported by evidence in the record***

{¶ 36} In proposition of law No. 3, U.S. Tubular argues that the commission abused its discretion by finding that the VSSR was the proximate cause of Roush's injuries.  U.S. Tubular asserts that Roush's injuries were caused by his exiting the safety zone while the pipe was pressurized, due to his own and/or Drosnos's negligence.  However, the defense of unilateral negligence by an employee is available to an employer in a VSSR case only if the employer has complied with the specific safety requirement and the employee has unilaterally violated it.  *State ex rel. Byington Builders, Ltd. v. Indus. Comm.*, 156 Ohio St.3d 35, 2018-Ohio-5086, 123 N.E.3d 908, ¶ 39-40.  As explained above, that is not the case here: evidence supported the commission's determination that U.S. Tubular violated Ohio Adm.Code 4123:1-5-05(D)(1).

{¶ 37} U.S. Tubular also asserts that the existence, within easy reach of Roush, of a means of disengaging the machine from its power source would not have prevented Roush's injury because Roush would still have approached the pressurized pipe based on Drosnos's mistakenly signaling that it was safe to do so. This argument misses the point: if Roush had had an independent means of disengaging the machine's power, he would not have had to rely on a signal from Drosnos in the first place.

{¶ 38} We rejected a similar argument in *State ex rel. Glunt Industries, Inc. v. Indus. Comm.*, 132 Ohio St.3d 78, 2012-Ohio-2125, 969 N.E.2d 252.  In that case, the employer "argue[d] that the absence of safety equipment did not proximately cause [the] injury, because even if it had been available, [the injured

worker] would not have used it." *Id*. at ¶ 16. The employer based that argument on the injured worker's statement that "he did not need any safety equipment for the task he was performing when he was injured." *Id*. We concluded that the employer's assertion was "only conjecture" given the danger of the work environment, which placed the injured worker in proximity to a high-voltage circuit. *Id*. We also observed that the argument related less to proximate cause than to a unilateral-negligence defense, which we noted was available only if the employer complied with the specific safety requirement. *Id*. We reject U.S. Tubular's argument for the same reasons.

{¶ 39} We reject proposition of law No. 3.

### III. CONCLUSION

{¶ 40} For the foregoing reasons, we affirm the Tenth District's judgment.

Judgment affirmed.

O'CONNOR, C.J., and FISCHER, DONNELLY, and STEWART, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

BRUNNER, J., not participating.

_____

**KENNEDY, J., dissenting.**

{¶ 41} I dissent from the majority's affirmance of the judgment of the Tenth District Court of Appeals, which held that appellee Industrial Commission did not abuse its discretion when it found that appellant, U.S. Tubular Products, Inc., violated a specific safety requirement and that the violation proximately caused appellee John R. Roush's injuries. In my view, the commission abused its discretion in concluding that U.S. Tubular violated a specific safety requirement when it did not provide, within easy reach of Roush, a means to disengage a diesel engine and pumps used in hydro-testing operations. The commission's determination that Roush was the operator of a machine merely because he was integral to the testing process in which that machine was operated by another

employee runs contrary to the plain meaning of Ohio Adm.Code 4123:1-5-05(D)(1) and Roush's own testimony that he was not the operator of the machine. Therefore, I dissent and would reverse the judgment of the Tenth District Court of Appeals and grant a writ of mandamus ordering the commission to vacate its award for a violation of a specific safety requirement ("VSSR").

{¶ 42} To be entitled to an additional award over and above workers' compensation benefits for a VSSR, Roush had to show that (1) a specific safety requirement applied, (2) U.S. Tubular violated that requirement, and (3) the violation caused his injury. *State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, 47 N.E.3d 109, ¶ 15.

{¶ 43} The specific safety requirement at issue here, Ohio Adm.Code 4123:1-5-05(D)(1), provides that "[m]eans shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply." Ohio Adm.Code 4123:1-5-01(B)(92), in turn, defines "operator" as "any employee assigned or authorized to work at the specific equipment." The word "machine" is not defined in the applicable division of the Ohio Administrative Code. Therefore, this court must accord that word its plain and ordinary meaning. *See State ex rel. Byington Builders, Ltd. v. Indus. Comm.*, 156 Ohio St.3d 35, 2018-Ohio-5086, 123 N.E.3d 908, ¶ 23-24 (applying the dictionary definition of a term not defined in the Ohio Administrative Code).

{¶ 44} The most relevant definition of the word "machine" in the dictionary is "an assemblage of parts that are usu[ally] solid bodies but include in some cases fluid bodies or electricity in conductors and that transmit forces, motion, and energy one to another in a predetermined manner and to some desired end." *Webster's Third New International Dictionary* 1353 (2002); *see also Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/machine (accessed Mar. 25, 2021) [https://perma.cc/YGU5-PDZB] (defining "machine" as "a mechanically, electrically, or electronically operated device for performing a task" and "an

assemblage * * * of parts that transmit forces, motion, and energy one to another in a predetermined manner").

{¶ 45} U.S. Tubular's hydro-testing operation uses pumps powered by a diesel engine to pressurize a pipe that is capped at each end with a swage. The north end of the pipe is capped with a threaded swage that has a hose attached to it. The south end of the pipe is capped with a threaded swage to seal the pipe.

{¶ 46} Once the south-end employee caps the pipe with the threaded swage, the employee moves to a safety zone, which is roughly 20 feet away from the south-end employee's workstation. The north-end employee then operates the machine by opening a valve to the pump, thereby allowing water to fill the pipe, building pressure to test the pipe.

{¶ 47} On the day of the accident, Roush was the south-end employee. His functions were to screw the threaded swage onto the south end of the pipe and close the valve on his swage once the pipe was full of water. Then, during pressurization, Roush was required to move to his safety zone. Once the test was complete and the pressure was released by the north-end employee, Roush was to return to the south end of the pipe and remove his swage.

{¶ 48} The diesel-engine-powered pumps are plainly a machine within the common usage of the word. The engine and pumps are mechanically operated to perform a task—pressurizing the pipe—and they are assemblages of parts that transmit force and energy. The swages and the pipe being tested are not mechanically operated and they do not transmit force or energy—they do not move at all during testing, and the swages are attached and removed by hand before and after the machine is operated. Roush did not work "at the machine," and therefore U.S. Tubular was not required by Ohio Adm.Code 4123:1-5-05(D)(1) to provide a kill switch within Roush's reach.

{¶ 49} The majority relies on U.S. Tubular's admission to an investigator that " 'the tester consisted of one engine, two pumps, *two swages*, and one hose' "

14

as "acknowledg[ing] * * * that the swage at Roush's end of the pipe was a component of the hydro-test machine." (Emphasis added in majority opinion.) Majority opinion at ¶ 29. However, the words "tester" and "machine" are not synonymous—a mercury thermometer is a fever tester, but it is not a machine within the common usage of the word. U.S. Tubular admitted that the swages were part of the testing process, but it did not concede that they were part of a "machine."

{¶ 50} But even if the hydro-testing process as a whole could be considered to be a machine, then Ohio Adm.Code 4123:1-5-05(D)(1) is ambiguous and could refer both to the overarching testing process as well as the specific mechanical equipment powering it.

{¶ 51} When a specific safety requirement is ambiguous, a court is required to strictly construe it and to resolve all reasonable doubts concerning the meaning and applicability of that particular requirement in favor of the employer. *State ex rel. 31, Inc. v. Indus. Comm.*, 152 Ohio St.3d 350, 2017-Ohio-9112, 96 N.E.3d 246, ¶ 21. A VSSR award is a penalty imposed on an employer, *id.*, and we have explained that specific safety requirements must establish " 'specific and definite requirements or standards of conduct * * * [that] are of a character plainly to apprise an employer of his legal obligation toward his employees,' " (ellipsis and brackets added in *Precision Steel*) *Precision Steel*, 145 Ohio St.3d 76, 2015-Ohio-4798, 47 N.E.3d 109, at ¶ 17, quoting *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257, 291 N.E.2d 748 (1972), paragraph one of the syllabus.

{¶ 52} An employer cannot be penalized for failing to comply with a safety requirement unless "mandatory specific duties are apparent to [the] employer interpreting [the] provision." *State ex rel. Oliver v. Southeastern Erectors, Inc.*, 76 Ohio St.3d 26, 28, 665 N.E.2d 1108 (1996).

{¶ 53} As set forth above, the applicable provisions of the Ohio Administrative Code do not define the word "machine." Therefore, Ohio Adm.Code 4123:1-5-05(D)(1) does not resolve the ambiguity and could not have

plainly apprised U.S. Tubular that it was required to provide a kill switch at the diesel engine and pumps as well as any other place near the hydro-testing process where an employee was authorized to be, such as Roush's work area, which was roughly 40 feet from the engine and pumps at the north end of the pipe. Looking at the common usage of the word "machine" and construing it strictly in favor of the employer, as we must, Ohio Adm.Code 4123:1-5-05(D)(1) required U.S. Tubular to have a kill switch only at the engine and pumps, and U.S. Tubular complied with that duty. U.S. Tubular was not required to provide a kill switch within Roush's easy reach at the south end of the pipe.

{¶ 54} Roush's own testimony at the hearing before the staff hearing officer confirms this analysis. He testified:

> Q. * * * In Paragraphs 13 and 14 of your affidavit, it says "The controls to the tester were on the operator's side." What are you referring to as the tester in that sentence?
>
> A. The machine.
>
> Q. The machine?
>
> A. (Nodding head up and down.)
>
> Q. Okay. And that's the diesel engine and the pump, correct?
>
> A. Yes.
>
> Q. Okay. And that was located on [the north-end employee's] side of the building?
>
> A. Yes.
>
> Q. Was not located on your side of the building?
>
> A. No.

{¶ 55} Roush also explained his role in pressure testing the pipes:

Q. Then you put the swage on and that's just threaded with the ears, correct?

A. Yes.

Q. Tighten that by hand?

A. Yes.

Q. There's no machinery that tightens that?

A. No.

Q. You're just supposed to tighten it by hand. Then the other operation you do is you close that slide valve. The slide valve is located on the swage, correct?

A. Yes.

Q. Is the swage or the slide valve motorized at all?

A. No.

Q. That's just a piece of metal, right?

A. Yes.

Q. Okay. All right. And other than that, were you operating any equipment?

A. No.

Q. Okay. And [the north-end employee], at the other end of the building, was the operator of the equipment?

A. Yes.

{¶ 56} Roush himself understood that the word "machine" referred only to the diesel-powered pumps, not the swage that he hand-tightened onto the opposite end of the pipe. Yet, notwithstanding Roush's admission that he was not an operator of the machine, his expert gave two reasons why he believed that Roush was an operator—both of which the majority opinion relies upon in its analysis:

first, Roush was integral to the pressure-testing operation, and second, Roush faced the same hazard as the worker on the other end of the pipe and therefore deserved to have the same protection (access to a kill switch). But being integral to a process and a specific risk to the employee are not relevant to proving that Roush was an *operator* of the *machine*. Rather, Ohio Adm.Code 4123:1-5-05(D)(1) requires a kill switch within easy reach only when the employee is assigned or authorized to work *at the machine*. Therefore, the expert's opinion is not some evidence supporting the commission's finding.

{¶ 57} But even if Ohio Adm.Code 4123:1-5-05(D)(1) required a kill switch at Roush's end of the pipe, there is no evidence that a violation of that rule caused Roush's injury for three reasons. First, Roush mistakenly believed that the pressure had been released from the pipe before he left his safety zone based on a thumbs-up signal from the north-end employee. His own expert testified that Roush would not have been able to know whether the pipe was pressurized since there was no pressure gauge at Roush's end of the pipe. There is no evidence that Roush would have acted any differently had a kill switch been provided at his end of the pipe, and it is his burden to prove that the lack of a kill switch caused his injury. Second, a pressure gauge at his end of the pipe may or may not have prevented the accident; but having a gauge is not a specific safety requirement established by the commission and therefore cannot factor into an analysis of proximate cause. And third, there is no evidentiary basis to believe that Roush would have had time to engage a kill switch before the swage on the other end of the pipe failed. Roush's expert testified that Roush should have had a kill switch *within the safety zone*, but Roush was not in the safety zone at the time of the accident. Kill switches are only required to be "at the machine." When Roush was in his safety zone he was not at the machine—his safety zone was roughly 20 feet away from the hydro-testing process.

{¶ 58} For these reasons, I would reverse the judgment of the Tenth District Court of Appeals, grant a writ of mandamus, and vacate the VSSR award.

DEWINE, J., concurs in the foregoing opinion.

_____

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Edward D. Murray, and Zachary M. Soehnlen, for appellant.

Dave Yost, Attorney General, and Natalie J. Tackett, Assistant Attorney General, for appellee Industrial Commission of Ohio.

Mario Gaitanos, for appellee John R. Roush.

_____